**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL DELUZIO** | : | |
| **Plaintiff** | : | |
| **VS.** | : | **3:CV-00-1220** |
| | : | **(JUDGE VANASKIE)** |
| **MONROE COUNTY, MONROE** | : | |
| **COUNTY CHILDREN AND YOUTH** | : | |
| **SERVICES, CHRISTINA IACANO, SAT** | : | |
| **P. BAHL, PAUL J. SEYBOLD, RICHARD** | : | |
| **BIELAT and ROBERT GRESS,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Before the Court is Defendants Sat P. Bahl, Richard Bielat, and Christina Iacano's

Motion for Judgment as a Matter of Law or, in the alternative, for a New Trial.  (Dkt. Entry 164-

1.)  Plaintiff Michael DeLuzio filed a complaint alleging that Defendants violated his civil rights in

connection with his employment, and termination thereof, at Monroe County Children and

Youth Services ("C & Y").  Following a trial, the jury returned a verdict in favor of Mr. DeLuzio

and against Defendant Bahl on Mr. DeLuzio's claim that Defendant Bahl recommended his

discharge in retaliation for First Amendment protected activities.[1]  The jury awarded Mr.

DeLuzio back pay of $88,900, and also assessed punitive damages of $25,000.  The jury also

found that Defendants, individually and in conspiracy with each other, deprived Mr. DeLuzio of

---

[1]The jury found in favor of Defendant Bahl on Mr. DeLuzio's claim that he was denied a promotion in retaliation for First Amendment protected activities.

a meaningful opportunity to be heard prior to his termination in violation of his Fourteenth

Amendment procedural due process rights.  The jury assessed punitive damages against

Defendant Bahl in the amount of $40,000; against Defendant Bielat in the amount of $10,000;

and against Defendant Iacano in the amount of $25,000.  Defendants challenge the verdicts

with the instant post-trial motions.  For the reasons that follow, Defendants' motion will be

granted as to the claim that Defendants denied Mr. DeLuzio due process with respect to the

pre-termination hearing he was afforded, and will be denied as to the claim that Mr. Bahl

recommended that DeLuzio be fired in retaliation for Mr. DeLuzio's exercise of First

Amendment-protected speech.

## I. **BACKGROUND**

Mr. DeLuzio started working for C & Y in October 1992, and at the time of his

termination he was a Caseworker II in the Family Preservation Unit, working with an assigned

caseload of children and families at risk.  Mr. DeLuzio worked at C & Y until February 18, 1999,

when he was suspended without pay pending a disciplinary investigation.  The investigation

ultimately led to his termination.

Defendant Bahl has been employed by C & Y since 1975 and became Administrator of

C & Y on July 15, 1996, a position he has held ever since.  Defendant Iacano started working at

C & Y in 1997 as a caseworker and became Mr. DeLuzio's supervisor on November 28, 1998.

Defendant Bielat is the personnel director for Monroe County.

The evidence at trial showed that Mr. DeLuzio was not reluctant to challenge his supervisors on matters affecting the delivery of services to children and families in Monroe County.  First, in November 1996, within months of the time that Defendant Bahl became the Administrator of C & Y, Mr. DeLuzio was present at a staff meeting when Defendant Bahl asked the employees to voice any concerns the staff had regarding C & Y.  Mr. DeLuzio responded by stating that, "I believe your across-the-board budget cuts are placing kids at risk," or words to that effect.  Second, in March 1997, Mr. DeLuzio spoke with Paul J. Seybold and sent two memoranda to Defendant Bahl raising concerns about the treatment strategy employed by Mr. Seybold with respect to a 14 year old girl who was allowed to see a 17 year old boy with whom she had a sexual relationship.  (See Plaintiff's Exhibits ("PX") 15 & 16.)  Mr. DeLuzio was concerned that the strategy would encourage the sexual relationship, thereby placing the girl at further risk.  Finally, in May 1998, Mr. DeLuzio learned that a teenage boy identified as MP had been involved in an inappropriate sexual relationship with his drug and alcohol counselor.  Mr. DeLuzio was the teen's caseworker at C & Y.  In a memorandum dated May 14, 1998, Mr. DeLuzio requested that the drug and alcohol counselor be reported to the Pennsylvania Chemical Abuse Certification Board so that the counselor would not be in a position to continue her drug and alcohol counseling and putting other young people at risk.  (See PX- 27.)

Mr. DeLuzio presented evidence that supported a rational inference that Defendant Bahl had been hostile towards him since Mr. DeLuzio's comments in November 1996 about the

budget cuts.  Eventually, this hostility culminated in two allegedly retaliatory actions.  First, in October 1998, Mr. DeLuzio applied for a promotion from Caseworker II to Caseworker Manager.  Mr. DeLuzio was denied the promotion in favor of Defendant Iacano, who had been at C & Y for a much shorter period of time than Mr. DeLuzio.  Ms. Iacano then became Mr. DeLuzio's supervisor.

The second instance of alleged retaliation was Mr. DeLuzio's termination.  In February of 1999, Defendant Iacano was reviewing employee case files, including Mr. DeLuzio's, when she was unable to locate certain required documentation.  Mr. DeLuzio was suspended without pay on February 18, 1999, pending the outcome of a disciplinary investigation.

The investigation, conducted by Defendant Iacano, led to various charges of misconduct against Mr. DeLuzio, detailed in a seven-page letter dated March 26, 1999.  (PX- 67.)  In addition to having incomplete files, Mr. DeLuzio was alleged to have failed to return a date planner and laptop computer that were C & Y property until February 26, 1999; confronted a family who made an anonymous complaint against Mr. DeLuzio, thereby defeating the family's expectation of confidentiality; failed to respond to a page while on duty; failed to make regular home visits; bombarded C & Y and county officials with memoranda demanding action to the point of insubordination; accused Defendant Bahl of conspiring to get rid of him; and made derogatory sexist comments to female co-workers.  (See PX- 67.)

Mr. DeLuzio received the written notice of the charges on March 26, 1999; met with

Defendants on March 31, 1999; and was informed of his termination on April 7, 1999, although the termination was retroactive to the date of his suspension.  Mr. DeLuzio eschewed a challenge to his termination via post-termination processes available to him under Pennsylvania law.

On July 7, 2000, Mr. DeLuzio commenced this action against Monroe County; C & Y; Paul J. Seybold; Robert Gress; and Defendants Bahl, Bielat, and Iacano.  (See Dkt. Entry 1.) An amended complaint was filed on November 9, 2000.  (See Dkt. Entry 12.)  Mr. DeLuzio asserted various claims, including infringement of First, Fifth, and Fourteenth Amendment rights; conspiracy; violation of whistle-blowing laws; wrongful discharge; intentional interference with contractual and potential contractual relationships; sex discrimination; and discrimination on the basis of military background.[2]  (Id.)  As a result of various pretrial rulings, the claims presented at trial were limited to retaliation, procedural due process, and civil conspiracy.

As noted above, the jury returned a verdict in favor of Mr. DeLuzio and against Defendant Bahl on the claim that Defendant recommended his termination in retaliation for First Amendment protected activities, but against Mr. DeLuzio on the failure to promote retaliation claim.  The jury awarded Mr. DeLuzio $88,900 in back pay and $25,000 in punitive damages. The jury also returned a verdict in favor of Mr. DeLuzio against all three Defendants on the

---

[2]The Court had jurisdiction over the federal constitutional and civil rights claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

procedural due process and civil conspiracy claims.  The jury did not award compensatory damages on those claims, but did award Mr. DeLuzio punitive damages against Defendant Bahl in the amount of $40,000; against Defendant Bielat in the amount of $10,000; and against Defendant Iacano in the amount of $25,000.

Defendants timely moved for judgment as a matter of law or, in the alternative, for a new trial.  The motion has been briefed and is ripe for disposition.

## II. DISCUSSION

### A. Motion for Judgment as a Matter of Law

A district court may grant a motion for judgment as a matter of law if, and only if, "viewing the evidence in the light most favorable to [the nonmoving party] and giving [it] the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability."  Wittekamp v. Gulf & Western, Inc., 991 F.2d 1137, 1141 (3d Cir.), cert. denied, 510 U.S. 917 (1993).  The court may not weigh the evidence or otherwise adjudge the credibility of the witnesses.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000); McDaniels v. Flick, 59 F.3d 446, 453 (3d Cir. 1995).  Moreover, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  Reeves, 530 U.S. at 151.  "If the record contains even the 'minimum quantum of evidence upon which a jury might reasonably afford relief,' the verdict must be sustained."  Shesko v. City of Coatesville,

324 F. Supp. 2d 643, 647 (E.D. Pa. 2004) (quoting Keith v. Truck Stops Corp. Of America, 909 F.2d 743, 745 (3d Cir. 1990)).

### 1. First Amendment Retaliation Claim

Defendant Bahl argues that he is entitled to judgment as a matter of law on Mr. DeLuzio's First Amendment retaliation claim on three grounds.  First, Defendant Bahl contends that Mr. DeLuzio's statements did not constitute protected activity under the First Amendment because the statements did not relate to matters of public concern.  (See Defendants' Motion for Judgment as a Matter of Law and/or a New Trial ("Defendants' Motion"), Dkt. Entry 164-1, ¶¶ 1-3; Memorandum of Law in Support of Defendants' Motion for Judgment as a Matter of Law and/or a New Trial ("Defendants' Memorandum"), Dkt. Entry 174-1, at 7-10.)  Second, Defendant argues that his recommendation to terminate Mr. DeLuzio was not the product of a retaliatory motive.  (Defendants' Motion, ¶¶ 4-5; Defendants' Memorandum, at 10-13.)  Finally, Defendant argues Mr. DeLuzio would have been terminated regardless of his protected activity. (Defendants' Motion, ¶¶ 5-6; Defendants' Memorandum, at 14-17.)

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. CONST. amend. I.  The First Amendment applies to the states, their political subdivisions, and agents thereof through the Fourteen Amendment.  See Virginia v. Black, 538 U.S. 343, 358 (2003); Brown v. Armenti, 247 F.3d 69, 73 n.3 (3d Cir. 2001).  The Supreme Court has repeatedly held that public employees

do not forego First Amendment protections due to their public employment and, in certain instances, the First Amendment protects their right to speak as a citizen on matters of public concern.  See, e.g., United States v. National Treasury Employees Union, 513 U.S. 454, 466 (1995); Rankin v. McPherson, 483 U.S. 378, 383-84 (1987); Pickering v. Board of Education of Township High School District 205, Will County, Illinois, 391 U.S. 563, 568 (1968).

      To successfully pursue a First Amendment retaliation claim, the plaintiff must prove that he engaged in an activity protected by the First Amendment and "that the protected activity was a substantial factor in the alleged retaliatory action."  Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006) (citing Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005)).  If the plaintiff establishes these two elements, the public employer may defeat liability by demonstrating it would have taken the same adverse employment action in the absence of the protected activity.  Id. at 241 n.23 (citing Mount Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287 (1977)).  As Defendant Bahl challenges all three elements in his post-trial motion, each will be addressed in turn.

### a) Protected Activity

      As a threshold matter, the statements of a plaintiff must be protected by the First Amendment.  Whether a statement constitutes a protected activity is a question of law reserved for the Court.  Hill, 455 F.3d at 241 (citing Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004)).  A public employee's statement is protected when:

(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have "an adequate justification for treating the employee differently from any other member of the general public" as a result of the statement he made.

Hill, 455 F.3d at 241-42.  Defendant Bahl complains only as to the second criterion – whether the three instances of speech by Mr. DeLuzio, determined by the Court to be protected activity, involved matters of public concern.  (See Defendants' Motion, Dkt. Entry 164-1, ¶¶ 1-3; Defendants' Memorandum, Dkt. Entry 174-1, at 7-10.)

Before resolving that issue, however, the Court must evaluate Mr. DeLuzio's speech in light of the Supreme Court's recent decision in Garcetti v. Ceballos,126 S. Ct. 1951 (2006).  In Garcetti, the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  Id. at 1960. There, Ceballos was a "calendar" deputy district attorney who was contacted by a defense attorney regarding inaccuracies in an affidavit employed to obtain a search warrant.  Id. at 1955.  Ceballos investigated the affidavit and concluded the affidavit contained "serious misrepresentations."  Id.  He then confronted the affiant and, after failing to elicit a satisfactory explanation, reported his findings to his supervisors and prepared a memorandum in which he recommended the case be dismissed.  Id. at 1955-56.  Following a tense meeting among Ceballos, his supervisors, the affiant, and other law enforcement personnel, the district attorney's office decided to move forward with the prosecution.  Id. at 1956.  The defense

attorney filed a motion challenging the warrant, and Ceballos was called to testify by the defense.  Id.  The trial court rejected the challenge.  Id.  Subsequent to these events, Ceballos alleged his employer retaliated against him for his memorandum by reassigning him to a trial deputy position, transferring him to another courthouse, and denying him a promotion.  Id.

In concluding that Ceballos was not speaking as a citizen when he prepared and presented his memorandum to his supervisors, the Court found dispositive that Ceballos expressed his views pursuant to his official duties.  Id. at 1959-60.  "That consideration – the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case – distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline."  Id. at 1960.  The Court reasoned that limiting an employee's speech that arises only because of his employment responsibilities does not encroach freedoms he may enjoy as a citizen; such limitation merely "reflects the exercise of employer control over what the employer itself has commissioned or created."  Id.  Employers have an important interest in maintaining the accuracy and sound judgment of official communications, as well as ensuring that official speech advances the employer's objectives.  Id.  Certainly, speech outside of one's official duties may enjoy a measure of First Amendment protection because it is comparable to speech of citizens not affiliated with government employment.  Id. at 1961; see also Pickering, 391 U.S. at 566 (letter from teacher to newspaper regarding funding of school district); McGreevy v. Stroup, 413 F.3d 359, 361-62

(3d Cir. 2005) (public school nurse advocating on behalf of two disabled children and speaking out against employing unlicensed professionals to spray pesticides on school grounds). "When a public employee speaks pursuant to employment responsibilities, however, these is no relevant analogue to speech by citizens who are not government employees." Garcetti, 126 S. Ct. at 1961. As such, because Ceballos wrote the memorandum in the course of his duties – indeed, he was performing the work he was paid to perform – the First Amendment did not protect him from managerial discipline in relation thereto.

The Court in Garcetti declined to formulate an analytical framework to be utilized in defining the scope of an employee's duties because the parties there did not dispute that Ceballos wrote the memorandum pursuant to his official duties. Id. However, lower federal courts have confronted this issue and those decisions are instructive. In Freitag v. Ayers, 463 F.3d 838, 842 (9th Cir. 2006), a former female correctional officer alleged she suffered retaliation in response to her speech after she reported and spoke out against a sexually hostile environment perpetrated by male prisoners. The former officer had reported the inmates' sexually hostile behavior to her supervisors using the prison's internal forms. Id. at 842-44. She also wrote two letters to a state senator and was interviewed by the Office of the Inspector General ("OIG"), who investigated the allegations in her letters. Id. at 844. The court concluded that plaintiff's letters to the state senator and her statements to the OIG were not pursuant to her official duties, reasoning that her official tasks did not include complaining to a

state senator or OIG about the prison's failure to eliminate the sexually hostile environment.  Id. at 854.  She was fulfilling her responsibility as a citizen by exposing the wrongdoing.[3]  Id.; see also Hailey v. City of Camden, Civ. No. 01-3967, 2006 WL 1875402, at *16 (D. N.J. July 5, 2006) (deputy fire chiefs were acting as citizens when they spoke out against safety concerns, overtime, and hiring decisions by attending city council meetings and talking with newspapers; no evidence that such conduct was part of their official duties).

In Price v. Macleish, Civ. A. Nos. 04-956(GMS) & 04-1207(GMS), 2006 WL 2346430, at *1 & 3 (D. Del. Aug.14, 2006), the plaintiffs were employed as Delaware State Troopers and assigned to an indoor shooting range used by the troopers.  The troopers, concerned about the health risks posed by the ventilation system and the bullet trap, reported their concerns up the chain of command.  Id. at *3.  After the shooting range was formally closed, the plaintiffs provided statements to the state auditor in connection with an investigation.  Id. at *4.  The plaintiffs alleged the defendants retaliated against them following these events.  Id.  The court concluded that plaintiffs had acted pursuant to their official duties, rather than as citizens, and therefore were not entitled to First Amendment protection.  "'The proper inquiry is a practical one,' and the court must look 'to the duties an employee actually is expected to perform.'" Id. at

---

[3]Plaintiff's internal reports of misconduct, however, were not protected by the First Amendment because she was acting in her capacity as a correctional officer.  Freitag, 463 F.3d at 855.  She formally reported the events on official forms used to document inmate misconduct.  Id. at 842-44.

*6 (quoting Garcetti, 126 S. Ct. at 1961-62).  Drawing upon Third Circuit political patronage cases involving the issue of whether an employee is a "policymaker," the court recognized the scope of an employee's official duties can be discerned by evaluating the expectations of the employer and supervisors, prior employees in the same position, and the employee himself.  Id. (quoting Wetzel v. Tucker, 139 F.3d 380, 383-84 (3d Cir. 1998)).  The evidence demonstrated that reporting the concerns regarding the indoor shooting range up the chain of command was within the scope of the plaintiffs' duties because the plaintiffs' supervisors praised the reporting in employment evaluations; former employees in the same positions spoke to their supervisors about the health concerns; and the plaintiffs themselves believed they had a responsibility to report the hazardous conditions up the chain of command.  Id. at *6-8; see also Hill, 455 F.3d at 242 (affirming dismissal of plaintiff's First Amendment claim insofar as it was premised upon his reporting of employees' complaints to the borough council; plaintiff asserted he passed along the complaints to fulfill his responsibilities as borough manager).  The statements to the state auditor were within the plaintiffs' duties as well because the plaintiffs were ordered to cooperate with the investigation.  Price, 2006 WL 2346430, at *8.  Since none of the plaintiffs' speech was protected by the First Amendment under Garcetti, judgment was entered for the defendants. Id.

In reviewing the statements by Mr. DeLuzio against the backdrop of the post-Garcetti decisional law, it is evident he was speaking in his capacity as a citizen, rather than pursuant to

his official duties as a caseworker for C & Y.  In 1996, Defendant Bahl became administrator at C & Y.  Mr. DeLuzio was concerned that Defendant Bahl's proposed budgetary cuts would harm the children who relied upon C & Y's services.  At a meeting shortly after Defendant Bahl assumed his new role, Mr. Deluzio expressed his concerns to Defendant Bahl about the risks associated with the funding cutbacks.  There was no evidence offered that Mr. DeLuzio spoke pursuant to his duties as a caseworker, or that he was hired to analyze the agency's budget.  Instead, Mr. DeLuzio was fulfilling his responsibility as a citizen in exposing the risks to children created by funding reductions.  See Freitag, 463 F.3d at 854.  Furthermore, Mr. Deluzio's statements are analogous to a city resident's comments during a city council meeting.  Accordingly, Mr. DeLuzio's communication was entitled to First Amendment protection.

Mr. DeLuzio expressed concerns in 1997 to Defendant Bahl about Paul Seybold's instructions to then-caseworker Defendant Iacano to coordinate a meeting between a fourteen year old female in C & Y custody and a seventeen year old male with whom she was having a sexual relationship.  (See PX-s 15 & 16.)  Mr. DeLuzio was concerned that this treatment strategy would expose the child to additional risks.  Once again, there is no evidence that Mr. DeLuzio made these statements pursuant to his duties as a caseworker.  Unlike the plaintiffs in Price, there is no indication that Mr. DeLuzio or his supervisors expected Mr. DeLuzio to report his concerns regarding other caseworkers or to monitor their cases.  See also Wilcoxon v. Red Clay Consolidated School District Board of Education, 437 F. Supp. 2d 235, 243 (D. Del. 2006)

14

("Plaintiff's journal containing the absences of a fellow teacher was not written pursuant to his official duties as a teacher.  He was not employed to monitor the absences of fellow teachers").  Mr. DeLuzio was responsible for his assigned cases, and he was not compensated to draft the memoranda he presented to Defendant Bahl.  Compare Garcetti, 126 S. Ct. at 1960 (writing a memorandum recommending dismissal of a case was a duty Ceballos was paid to perform).  Moreover, Mr. DeLuzio wrote the memorandum on his own paper, rather than official C & Y complaint forms.  Compare Freitag, 463 F.3d at 842-44, 855.  Therefore, Mr. DeLuzio's statements in 1997 were made as a citizen and, as such, can be afforded First Amendment protection.

Lastly, in 1998, Mr. DeLuzio expressed concerns to Defendant Bahl regarding another minor in C & Y custody.  This time, a male child was having an inappropriate relationship with his drug and alcohol counselor.  (See PX- 27.)  The counselor was employed by Pocono Mountain Center, whose services were used by C & Y clients.  Mr. DeLuzio thought the therapist should be reported to her licensing body – the Pennsylvania Chemical Abuse Certification Board.  As with the two previous instances, there is no evidence that Mr. DeLuzio was speaking in a capacity other than as a concerned citizen exposing potential malfeasance in the provision of social services.  To be sure, the teenager was one of Mr. DeLuzio's clients, and Mr. DeLuzio stated his belief "that by remaining silent I will compromise my professionalism and ethics."  (Id.)  However, the fact Mr. DeLuzio felt he was morally obligated to report the

inappropriate relationship does not equate to an employment duty to do so.  A private citizen

could be under a similar moral compulsion to disclose the conduct of the counselor, especially

when a child with a history of drug and alcohol issues is involved.  Furthermore, while Mr.

DeLuzio was employed to work with the child as his caseworker, there was no evidence that he

was employed to report misconduct by non-employee drug and alcohol counselors to their

licensing body.  Therefore, these statements were made outside Mr. DeLuzio's employment

duties and may be afforded First Amendment protection.

Having concluded Mr. DeLuzio was speaking as a citizen on the three separate

occasions, it must now be determined whether those statements relate to matters of public

concern.  "A public employee's speech involves a matter of public concern if it can 'be fairly

considered as relating to any matter of political, social, or other concern to the community.'"

Green v. Philadelphia Housing Authority, 105 F.3d 882, 885-86 (3d Cir. 1997) (quoting Connick

v. Myers, 461 U.S. 138, 146 (1983)).  The speech at issue must be evaluated in light of its

content, form, and context.  Id.  "The content of the speech may involve a matter of public

concern if it attempts 'to bring to light actual or potential wrongdoing or breach of public trust on

the part of government officials.'"  Baldassare v. State of New Jersey, 250 F.3d 188, 195 (3d

Cir. 2001) (quoting Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993)).  Moreover,

the Supreme Court has stated that speech addressing public concerns includes "subject[s] of

legitimate news interest; that is, a subject of general interest and of value and concern to the

public at the time of publication." City of San Diego v. Roe, 543 U.S. 77, 84 (2004); see also

Wilcoxon, 437 F. Supp. 2d at 244 ("[T]he detailed account of a public school teacher's

dereliction of duty to her students and co-workers [due to her frequent absences and recurring

tardiness] is a matter of public concern."); Smith v. Central Dauphin School District, 419 F.

Supp. 2d 639, 647 (M.D. Pa. 2005) (teacher complained of the presence of mold in the school

district's buildings, a "topic of great concern to the community, especially to those families

whose children attend the schools in the district").

Speech by public employees that relates to their employment may be a matter of public

concern, provided it is not limited to matters of self-interest. Swineford v. Snyder County, 15

F.3d 1258, 1271 (3d Cir. 1994).  In fact, speech that highlights wrongdoing or hazards within an

agency may be protected when the matters would be of concern to the community.  See

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003).  In Brennan, the plaintiff, a firefighter, was

ordered to clean the basement of the fire station but objected because of the presence of

asbestos.  Id. at 408.  The deputy chief threatened the plaintiff if he pursued the issue;

nevertheless, the plaintiff filed a formal complaint with the state department of labor and health.

Id.  The district court ruled the asbestos complaint was a matter of personal interest, affecting

only the plaintiff and other firefighters, and therefore not protected by the First Amendment.  Id.

at 415.  On appeal, the defendants relied upon this reasoning, as well as the fact that fire

stations are generally not open to the public, in asserting that the presence of asbestos inside a

17

fire station can never be a public concern.  Id.  The court rejected this argument, agreeing with

the plaintiff that the public has an interest in whether there is compliance with public safety

laws.  Id.  The court explained that "[r]esidents of the Township clearly had an interest in

knowing that their tax dollars were being spent on an asbestos contaminated fire station that

endangered the health and lives of its firefighters."  Id.

An employee's criticism of the internal operations of his public employer can also involve

matters of public concern.  In Zamboni v. Stamler, 847 F.2d 73 (3d Cir. 1988), a detective with

a county prosecutor's office criticized the defendant prosecutor's reorganization of the office.

Id. at 75-76.  The county prosecutor announced his reorganization plan in which all promotions

would be discretionary, rather than on the basis of merit and fitness as required by the civil

service act.  Id. at 75.  The plaintiff privately complained to the defendant and then publicly

criticized the defendant's reorganization plan by writing a letter to the state civil service

commission and filing a state court action.  Id. at 75-76.  Our Court of Appeals concluded that

the plaintiff's speech touched upon matters of public concern, reasoning that the plaintiff's

opposition to the reorganization and the promotion policy raised "significant issues" regarding

the prosecutor's performance of his duties and possible circumvention of the civil service laws.

Id. at 77.

In the matter at hand, Mr. DeLuzio's statements addressed important issues within C &

Y.  Mr. DeLuzio's comments to Defendant Bahl about the impact of funding reductions on the

ability of C & Y to provide services to the children within its custody clearly touched upon

matters of public concern.  Mr. DeLuzio was worried that reduced spending and budget cuts

would expose children to unnecessary risks.  Mr. DeLuzio made his statement in response to

Defendant Bahl's request for comments from employees.  Expenditures by government

agencies are topics of genuine interest within the community.  Indeed, it was a letter to a local

newspaper regarding the school district's handling of revenue that was afforded First

Amendment protection in Pickering.  As such, Mr. DeLuzio's statement constituted protected

activity.

Mr. DeLuzio's statements in 1997 about arranging a meeting between a fourteen year

old female and a seventeen year old male with whom she was sexually involved, as well as his

statements in 1998 about the drug and alcohol counselor's inappropriate relationship with a

male child, also addressed matters of public concern.  Both instances are like the

communications in Brennan, Zamboni, Wilcoxon, and Smith in that Mr. DeLuzio's statements

either exposed potential wrongdoing and danger within C & Y or criticized the internal

operations of C & Y.  Mr. DeLuzio's memoranda to Defendant Bahl about the meeting between

the teenage girl and her paramour raised significant issues about the judgment of C & Y, its

treatment strategies, and its commitment to changing the lives of children for the better.  The

statements in 1998 about the drug and alcohol counselor's inappropriate relationship with a

male child in C & Y custody would also be of interest to the community.  Children come to C &

Y to be helped, not to be exploited by those entrusted with the responsibility to achieve that objective. The fact that the drug and alcohol counselor was not employed by C & Y, but by an independent entity, does not change the outcome. The community has an interest in ensuring that C & Y is not derelict in its duty to use care when assigning responsibilities to those outside the agency. Accordingly, Mr. DeLuzio's statements were protected by the First Amendment.

Defendant Bahl argues that Mr. DeLuzio's statements cannot be protected because the statements were confined to the workplace. While Mr. DeLuzio did not write a letter to the editor or speak at a county commissioners' meeting, such public declarations are unnecessary for speech to be protected by the First Amendment. In Azzaro v. County of Allegheny, 110 F.3d 968, 970-72 (3d Cir. 1997), an employee reported an incident of sexual harassment to her superiors. In holding the employee's complaints involved matters of public concern, the court explained:

> [T]he community's interest in the free exchange of information and ideas relating to matters of public concern is not limited to public declarations. That interest is implicated in private exchanges between two individuals as well as in exchanges between an individual and members of the public. Private dissemination of information and ideas can be as important to effective self-governance as public speeches. Thus, if the content and circumstances of a private communication are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community, that communication is public concern speech even though it occurred in a private context.

Id. at 977-78. As explained in Givhan v. Western Line Consolidated School District, 439 U.S. 410, 415-16 (1979), "[n]either the [First] Amendment itself nor our decisions indicate that this

freedom [of speech] is lost to the public employee who arranges to communicate privately with the employer rather than to spread his views before the public."

Finally, Defendant Bahl insists that Mr. DeLuzio's statements regarding the C & Y budget and the arranged meeting and treatment strategy of the fourteen year old girl cannot be protected speech because the statements were "substantively wrong." (Defendants' Memorandum, Dkt. Entry 174-1, at 9.) There is no evidence that the 1997 statements contained false assertions of fact. As far as Mr. DeLuzio's statement about the budget cuts, Defendant's Bahl's testimony may have contradicted some of those concerns. However, Defendant's argument is unavailing because "[t]he issue is not falsity vel non but whether such statements, even if untrue, were knowingly and recklessly made." Springer v. Henry, 435 F.3d 268, 278 (3d Cir. 2006) (citing Pickering, 391 U.S. at 574). Defendant introduced no evidence that Mr. DeLuzio knowingly made false statements regarding the C & Y budget. To the contrary, the evidence revealed Mr. DeLuzio's genuine belief that the funding cuts of C & Y services would be reduced under Bahl. In this regard, it is pertinent that Defendant Bahl became the Administrator of C & Y in order to return some fiscal soundness to its operations. Because expenditures by Mr. Bahl's predecessor had exceeded budgeted amounts, it is reasonable to infer that spending under Mr. Bahl would be reduced. Moreover, courts should be reluctant to sanction government punishment of speakers merely because the speech included incorrect statements, absent proof the falsities were knowingly or recklessly uttered.

To require a speaker to undertake extensive research on a subject in an effort to guarantee the accuracy of his comments could chill speech to a degree intolerable under the First Amendment.  Free exchange of ideas, even if involving unintended inaccuracies, is imperative to the efficient operation of a democratic government.  Accordingly, even if Mr. DeLuzio's statements contained inadvertent mistakes, the statements are entitled to First Amendment protection.

### b) Substantial Factor in Retaliatory Action

Defendant Bahl argues that there was insufficient evidence for the jury to conclude that Mr. DeLuzio's protected speech was a substantial factor in recommending Mr. DeLuzio's termination.  Unlike the issue of whether Mr. DeLuzio's speech is protected, the question of whether speech was a substantial factor for an adverse employment action is a question of fact.  See Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006).  As such, the Court's review is limited to determining whether the record contains the "minimum quantum of evidence upon which a jury might reasonably" conclude that Mr. DeLuzio's speech was a substantial motivating factor in his termination.

In a First Amendment retaliation case, plaintiffs rarely have direct evidence of retaliation and, instead, must rely upon circumstantial evidence that the decision-makers took retaliatory action.  The timing between the protected activity and the adverse employment action may allow an inference of retaliation.  See Abramson v. William Paterson College of New Jersey,

260 F.3d 265, 288 (3d Cir. 2001); Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997); see also Holder v. City of Allentown, 987 F.2d 188, 196 (3d Cir. 1993) (official initiating enforcement proceedings three days after plaintiff's letter to the editor).  Here, the lapse of time between the instances of protected conduct and the firing do not support an inference of retaliatory motive.

In the absence of suggestive timing, the plaintiff could introduce evidence of intervening antagonism that occurred between the protected activity and adverse employment action. Compare Robinson v. Southeastern Pennsylvania Transportation Authority, 982 F.2d 892 (3d Cir. 1993) (in Title VII retaliation case, plaintiff could establish causal connection by evidence that his relationship with co-workers degenerated following discrimination complaints, and he was subjected to harsh discipline over trivial matters).  Viewing the evidence in the light most favorable to Mr. DeLuzio, there was sufficient evidence for the jury to conclude that Mr. DeLuzio's protected activity was a motivating factor in Defendant Bahl's decision to recommend Mr. DeLuzio's termination.  Although Mr. Bahl largely challenges the verdict due to lack of temporal proximity between the protected activity and the recommendation, he ignores the evidence of intervening antagonism between Mr. Bahl and Mr. DeLuzio from which the jury could reasonably infer a retaliatory motive.

Mr. DeLuzio testified to Mr. Bahl's hostility towards him since late 1996.  After Mr. DeLuzio's comments to Mr. Bahl that year regarding the C & Y budget cuts, Mr. Bahl

summoned Mr. DeLuzio into his office, scolded him, and threatened to terminate him should he

make similar statements in the future.  Mr. Bahl testified that he did not recall Mr. DeLuzio's

statements or the subsequent confrontation.  However, the jury was present for the testimony

of both witnesses and was entitled to resolve this discrepancy in favor of Mr. DeLuzio.

In January 1997, Mr. DeLuzio was reprimanded by Mr. Bahl for accompanying a child in

C & Y custody from Quakertown to the Kidspeace National Hospital in Orefield.  (See PX- 7.)

Mr. DeLuzio was previously told by Mr. Bahl not to transport the child.  Mr. DeLuzio did not

transport the child himself but followed the ambulance en route to Kidspeace.  Because the

child was in C & Y custody, it was necessary that a representative from C & Y travel to

Kidspeace to complete the necessary paperwork.  Mr. DeLuzio received a written reprimand for

this incident.  (PX- 7.)  Significantly, an arbitrator sustained Mr. DeLuzio's grievance of the

written reprimand, concluding that his actions "were not insubordinate, but rather responsible

and professional. . . ."  (PX- 12, at 9-10.)  Thus, the jury could conclude Mr. Bahl's reaction was

excessive, thereby revealing a retaliatory animus towards Mr. DeLuzio.

In March 1997, Mr. DeLuzio requested that he be removed from C & Y's on-call list.  Mr.

DeLuzio was in the United States Army reserves, which required his participation several

weekends a month.  Placement on the C & Y on-call list would interfere with Mr. DeLuzio's

reserve duties.  Defendant Bahl denied the request.

In early 1998, Defendant Bahl received a memorandum from James C. Meissner

regarding the mother of a child previously in C & Y custody.  (PX- 20.)  The child and his family were to be placed in C & Y custody again, and the mother was uncomfortable at the prospect of Mr. DeLuzio being the child's caseworker.  She alleged that in the past, Mr. DeLuzio devoted more attention to her than with the child.  Mr. Bahl issued a written warning to Mr. DeLuzio over this incident. (PX- 22.)  Mr. DeLuzio grieved this action, and Monroe County agreed to remove the written warning from Mr. DeLuzio's personnel file.  (PX- 26 and 70.)  If further agreed to refrain from raising the incident that prompted the reprimand in any further proceedings.  The jury could infer Mr. Bahl's reaction was excessive and simply another example of his hostility towards Mr. DeLuzio for his persistence in complaining about perceived problems.

Additionally, a performance evaluation was ordered of Mr. DeLuzio at the end of 1997 or early 1998, which was his first ever evaluation.  The evaluation, conducted by Paul Seybold, was negative. (PX- 17.)  Mr. DeLuzio testified that Mr. Seybold was nervous about the evaluation because Defendant Bahl had a role in the review.  Significantly, the State Civil Service Commission sustained Mr. DeLuzio's challenge to the employee performance review, instructing that it be expunged from his personnel records.  (PX- 19.)

In May 1998, Mr. DeLuzio wrote a memorandum to Defendant Bahl stating his concerns regarding one of his cases, the male child who was involved in an inappropriate sexual

relationship with his drug and alcohol counselor.[4]  (See PX- 27.)  Three months later,

Defendant Bahl removed files from Mr. DeLuzio's office, which interfered with his ability to

perform his employment duties.  Although Defendant Bahl had reviewed the files of other

employees in addition to Mr. DeLuzio, the jury could infer this merely provided Defendant Bahl

an opportunity to interfere with Mr. DeLuzio's work.  Moreover, the jury was free to reject as

incredible Defendant's explanation that he reviewed Mr. DeLuzio's files to check the mileage

sheets.  As such, Defendant Bahl's removal of the files provides further evidence of his

retaliatory animus towards Mr. DeLuzio.

Mr. DeLuzio also testified that he enjoyed the ability to work after hours in the C & Y

building.  However, approximately six months prior to his termination, his ability to do so was

eliminated by Mr. Bahl.  Mr. DeLuzio was told that Mr. Bahl did not want employees in the

building after hours for safety reasons.  Yet, Mr. DeLuzio testified that other employees

remained in the building after hours while he complied with Mr. Bahl's order.  The jury could

conclude this was part of the pattern of antagonism between Mr. Bahl and Mr. DeLuzio in the

---

[4]Defendant Bahl argues that because he eventually agreed with Mr. DeLuzio's recommendation to report the drug and alcohol counselor to her licensing agency, the jury could not conclude that he retaliated against Mr. DeLuzio.  (See Defendants' Memorandum, Dkt. Entry 174-1, at 13.)  However, the jury could infer that Defendant Bahl reluctantly agreed to avoid Mr. DeLuzio disclosing the matter himself.  Once Defendant Bahl realized the damage this affair could have on C & Y's image, Defendant's Bahl's decision to report the counselor could be viewed as an attempt to "spin" the ordeal in a manner less damaging to C & Y as well as Defendant himself, who, as Administrator, would be forced to explain the events.

wake of the latter's protected speech.

In short, there was sufficient evidence to support the jury's conclusion that Defendant Bahl recommended Mr. DeLuzio's termination in retaliation for Mr. DeLuzio's previous statements.  An antagonistic relationship between the two developed after the 1996 statements regarding the budget cuts and continued through Mr. DeLuzio's termination, a period of approximately two-and-one-half years.  Therefore, Mr. Bahl's motion for judgment as a matter of law on this basis will be denied.[5]

### c) Same Employment Action Without the Protected Activity

Finally, Defendant Bahl argues that the jury's failure to find that Mr. DeLuzio would have been terminated in the absence of the protected activity "was illogical and unsupported by the record."  (Defendants' Memorandum, Dkt. Entry 174-1, at 17.)  Once the plaintiff demonstrates that his protected activities were a substantial or motivating factor in an adverse employment action, "the burden shifts to the defendant to show 'by a preponderance of the evidence that it

---

[5]Contrary to Mr. Bahl's contention, there is no inherent inconsistency between the jury's finding that Plaintiff failed to prove retaliation in connection with the decision not to promote him to the Caseworker Manager position and its finding that retaliation had been proven in connection with the termination recommendation.  Ample evidence that Ms. Iacano had superior qualifications supported a determination that retaliation did not motivate the promotion decision.  By way of contrast, evidence of a pattern of antagonism, Plaintiff's otherwise satisfactory performance as a Caseworker II, and evidence that other caseworkers were not subject to the ultimate disciplinary sanction for missing documents and inappropriate language in the workplace would support a rational inference that Plaintiff had been singled out for firing because of his repeated complaints on matters of public concern.

would have reached the same decision even in the absence of the protected conduct.'"

Suppan, 203 F.3d at 235 (quoting Mount Healthy, 429 U.S. at 287).  A defendant may meet

this burden by demonstrating an independent basis for the action, such as the employee's

performance or conduct unrelated to the protected activity.  This is a question of fact for the jury

and, as such, the Court's review is narrow.

Throughout his brief, Defendant Bahl calls attention to the fact that Mr. Bahl did not have

authority to terminate Plaintiff's employment, and only the County Commissioners could take

that kind of action.[6]  This fact, however, is not controlling on the question of liability.  A jury

certainly could infer that Mr. Bahl's recommendation was the triggering factor in the decision to

fire Mr. DeLuzio.  "[T]he essence of section 1983's color of law requirement is that the alleged

offender, in committing the act complained of, abused a power or position granted by the state."

Bonenberger v. Plymouth Township, 132 F.3d 20, 23-25 (3d Cir. 1997).  "A supervisor who

lacks the power to terminate a subordinate's employment may nonetheless abuse his power

with respect to that subordinate, and may even constructively discharge the subordinate,

provided he (the supervisor) exercises some power over the employee."  Hill v. Borough of

Kutztown, 455 F.3d 225, 240 (3d Cir. 2006).

---

[6]To the extent Defendant Bahl complains about the special verdict questions that asked the jury to determine whether Defendant would have recommended Mr. DeLuzio's termination in the absence of the protected activity (see Defendants' Memorandum, Dkt. Entry 174-1, at 16-17; see also Special Verdict Questions, Dkt. Entry 143, at 3-4), Defendant waived this argument by failing to interpose an objection at trial.

In this case, there is no dispute that Mr. Bahl exercised considerable authority over

Plaintiff.  As C & Y Administrative, Mr. Bahl was in a position to recommend Mr. DeLuzio's

termination.  The jury could conclude that, as head of a government agency, Defendant Bahl's

recommendation would be accorded the most weight, regardless of the participation or input of

others.  Significantly, the defense did not call the County Commissioners as witnesses in this

matter.  Thus, there is no evidence that the County Commissioners would have acted in the

absence of Bahl's recommendation.  Accordingly, the relevant inquiry is not whether Defendant

Bahl had the authority to fire Plaintiff, but whether he would have recommended Mr. DeLuzio's

termination in the absence of the protected activity.

Mr. Bahl did offer legitimate reasons for why he recommended Mr. DeLuzio's

termination.  Defendant testified that his recommendation of Mr. DeLuzio's termination was

based upon the allegations set forth in the March 26, 1999, letter to Mr. DeLuzio   (See PX- 67.)

The allegations involved missing documentation, insubordination, and sexually inappropriate

comments to female co-workers, among other things.  (Id.)  Defendant Bahl also testified that

his recommendation was based upon Mr. DeLuzio's unsatisfactory answers at the meeting of

March 31, 1999.  The jury, however, was free to reject Defendant's explanation as merely

pretextual for the true reason – retaliation.  See Keenan v. City of Philadelphia, 983 F.2d 459,

464 n.6 (3d Cir. 1992) ("Given our procedural posture, however, we need only to consider

whether the plaintiffs presented evidence sufficient to support the verdict in their favor since the

jury was free to disbelieve the defendants' evidence on the legitimate reason defense on which

the defendants bore the burden of production and proof."). The jury had the opportunity to

observe Mr. Bahl's demeanor while he testified and could reasonably disbelieve his

explanation. As recounted above, there was evidence of Defendant Bahl's antagonism directed

towards Mr. DeLuzio in the wake of the 1996 statements and continuing throughout Mr.

DeLuzio's employment with C & Y. There was also evidence that other caseworkers were not

disciplined for missing documentation or inappropriate language in the workplace. The

evidence was sufficient to call into question the veracity of Mr. Bahl's asserted reasons for

having Mr. DeLuzio fired. Accordingly, Defendant Bahl's motion for judgment as a matter of

law on Mr. DeLuzio's First Amendment retaliatory discharge claim will be denied.

### 2. Punitive Damages Against Defendant Bahl on First Amendment Claim

Defendant Bahl challenges the jury's verdict imposing punitive damages of $25,000

against him on the First Amendment claim. Defendant argues that the evidence was

insufficient to support the jury's conclusion that his recommendation was motivated by an "evil

motive or intent," or involved "reckless or callous indifference" to Mr. DeLuzio's federally

protected constitutional rights.

"[A] jury may be permitted to assess punitive damages in an action under § 1983 when

the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves

reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461

U.S. 30, 56 (1983).  Our Court of Appeals has held that this standard is disjunctive such that the defendant's conduct need not be motivated by evil desire, provided he acted with reckless or callous indifference to the plaintiff's constitutional rights.  Brennan, 350 F.3d at 428-29 (quoting Savarese v. Agriss, 883 F.2d 1194, 1204 (3d Cir. 1989)).  An award of punitive damages is within the jury's discretion "'to punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future.'"  Wade, 461 U.S. at 54 (quoting RESTATEMENT (SECOND) OF TORTS § 908(1) (1977)).

In the matter at hand, the jury heard testimony about Defendant Bahl's ongoing hostility towards Mr. DeLuzio that began in late 1996, around the time of Mr. DeLuzio's comments regarding the C & Y budget.  Mr. Bahl initially threatened Mr. DeLuzio, then instituted excessive disciplinary measures against Mr. DeLuzio, including the Kidspeace incident and the Meissner memorandum regarding the mother's complaint.  Defendant Bahl ordered a performance evaluation of Mr. DeLuzio at the end of 1997 or 1998, his first during his tenure at C & Y that began in 1992.  The overall evaluation was negative, and the jury heard testimony that Defendant was involved in generating the poor result.

The evidence was sufficient to demonstrate that Mr. Bahl acted with reckless or callous indifference to Mr. DeLuzio's First Amendment rights.  Therefore, the imposition of punitive

damages was proper.[7]

The jury assessed punitive damages against Defendant Bahl in the amount of $25,000. This amount is not excessive.  It was for the jury to decide the appropriate amount to punish and deter Defendant for his retaliatory conduct.  Consequently, Defendant's motion for judgment as a matter of law on this issue will be denied.

### 3. Procedural Due Process

Defendants Bahl, Iacano, and Bielat challenge the jury's verdict that Mr. DeLuzio was deprived of his procedural due process rights.  Defendants assert that prior to Mr. DeLuzio's termination, he was provided with written notice of the allegations against him upon which termination could be based.  Thereafter, Mr. DeLuzio was afforded an opportunity to respond to the allegations at a meeting with Defendants.  Defendants contend these pre-termination proceedings comport with due process requirements and, as such, they are entitled to judgment as a matter of law.

The Fourteenth Amendment to the United States Constitution provides: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend XIV, § 1.  An essential principle of due process is that there be notice and an

---

[7]Defendant argues that punitive damages were not appropriate because his conduct was identical to the conduct of Defendants Iacano and Bielat, who had no knowledge of Mr. DeLuzio's protected activity.  (See Defendants' Memorandum, Dkt. Entry 174-1, at 18-19.) The record does not support this assertion, and Defendant ignores the evidence of his own antagonistic behavior in the wake of Mr. DeLuzio's protected activities.

opportunity for a hearing prior to the deprivation of an individual's property interest.  See

Cleveland Board of Education v. Loudermill, 470 U.S. 532, 542 (1985).  In Loudermill, a public

school security guard was terminated for allegedly providing false statements on his

employment application.  Id. at 535.  He was not provided an opportunity to respond to the

allegations prior to his termination.  In determining that a pre-termination hearing was

necessary, the Court balanced several competing interests:

> [T]he private interests in retaining employment, the governmental interest in
> the expeditious removal of unsatisfactory employees and the avoidance of
> administrative burdens, and the risk of an erroneous termination.

Id. at 542-43 (citing Mathews v. Elridge, 424 U.S. 319, 335 (1976)).  The Court recognized that

the opportunity for an employee to present his version of the events is invaluable to accurate

decisionmaking.  Id. at 543.  Even where the factual basis is apparent, "the only meaningful

opportunity to invoke the discretion of the decisionmaker is likely to be before the termination

takes effect."  Id.  Accordingly, where a public employee may be terminated only for cause,

due process requires he be given an "oral or written notice of the charges against him, an

explanation of the employer's evidence, and an opportunity to present his side of the story."  Id.

at 546.  See also Cipriani v. Lycoming County Housing Authority, 177 F. Supp. 2d 303, 318-20

(M.D. Pa. 2001).

In this case, it is undisputed that before any decision was made to fire Plaintiff a detailed

statement of the grounds for disciplinary action was given to him in Bahl's letter of March 26,

1999.  It is further undisputed that Plaintiff was given a full and fair opportunity to present his position with respect to the grounds presented in the letter of March 26, 1999.  The County Commissioners did not authorize his discharge until after he met with Defendants concerning the March 26th letter.  Plaintiff argues that the jury could determine that he was not accorded an opportunity to be heard at a "meaningful time and in a meaningful manner."  (Plaintiff's Brief in Opp. To Post-Trial Motion, Dkt. Entry 180, at 24.)  But nowhere does he explain why the meeting that occurred on March 31, 1999 was insufficient, either in its timing or the manner in which it was conducted.

Mr. Bahl's involvement in the March 31st meeting does not deprive the session of its compliance with due process mandates.  Due process does not require a neutral, impartial decision-maker during the pre-termination hearing, provided the terminated employee has adequate post-termination proceedings before an impartial decision-maker.  See McDaniels v. Flick, 59 F.3d 446, 460 (3d Cir. 1995).  In McDaniels, a tenured professor at a university was terminated following a complaint of sexual harassment by one of his students.  The professor argued on appeal that the district court erred in refusing to allow him to present evidence that the university's pre-termination hearing was a sham because the university never believed the sexual harassment allegation, but merely "pounced on Federici's complaint to get rid of a highly paid professor."  Id. at 458.  In rejecting the professor's position, the court found persuasive decisions by other circuits which had concluded that "'[a] demonstration that the decisionmaker

was biased . . . is not tantamount to a demonstration that there has been a denial of procedural

due process,'" particularly where the "employee was also entitled to a post-termination hearing."

Id. at 459 (quoting McKinney v. Pate, 20 F.3d 1550, 1562 (11th Cir. 1994) (en banc)); see also

id. at 459-60 (citing Walker v. City of Berkeley, 951 F.2d 182, 184 (9th Cir. 1991); Duchesne v.

Williams, 849 F.2d 1004, 1005 (6th Cir. 1988) (en banc)).  The court further explained:

> [A]n employment termination decision is made initially by the employee's
> direct supervisor or someone working in the same organization as the
> employee – a sensible approach given that such person often is already
> familiar with the employee's abilities and shortcomings as well as the needs
> and interests of the employer organization.  Yet, these individuals are also
> likely targets for claims of bias or improper motive simply because of their
> positions.  For example, personality discord may lead to charges that a direct
> supervisor was biased. Or, as here, budget squeezes may lead to charges
> that the motivation for the dismissal was to trim the budget.

Id. at 460.  The court concluded that to require a neutral decision-maker at this stage would be

"unduly cumbersome" and not necessary "where the state provides a neutral tribunal at the

post-termination stage that can resolve charges of improper motives."  Id.  See also Woo v. Bd.

of Educ. for County of Putnam, No. 94-2172, 1995 WL 568484, at *1 (4th Cir. Sept. 27, 1995)

(rejecting plaintiff's assertion that due process was violated where "members of Board of

Education . . . decided prior to the hearing that they would terminate" plaintiff because an

impartial decision-maker is not required at the pre-termination stage; due process was satisfied

where "[plaintiff] received notice, an opportunity to respond at the hearing and later availed

himself of the post-termination administrative procedures"); Belas v. Juniata County Sch. Dist.,

No. 1:CV-04-505, 2005 WL 2100666, at *7-8 (M.D. Pa. Aug. 25, 2005), aff'd, No. 05-4385, 2006 WL 2974128 (3d Cir. Oct. 18, 2006) (no due process violation where plaintiff asserted that defendant "did not fairly consider her responses due to his bias," but did not deny she had an opportunity to respond to the allegations prior to her suspension; plaintiff had the opportunity to redress any improper bias before the elected school board as well as de novo review before the Secretary of Education and the Commonwealth Court of Pennsylvania).

It is undisputed that there were adequate post-termination procedures available to Mr. DeLuzio.  Civil service commission appeal request forms were presented with the termination letter of April 7, 1999.  (PX- 68.)  Mr. DeLuzio could have sought redress for Defendant Bahl's improper bias by utilizing the available post-termination procedures.  Due process only required an opportunity to be heard before the termination decision was made.[8]  Plaintiff had that opportunity, and the jury's verdict to the contrary cannot stand.  Accordingly, Defendants' Motion for Judgment as a Matter of Law will be granted on the Procedural Due Process Claim. Moreover, as Plaintiff was not denied due process, the verdict on the related civil conspiracy claim will be set aside.

### B. **Motion for a New Trial**

In the alternative, Defendants move for a new trial under Federal Rule of Civil Procedure

---

[8]Plaintiff does not challenge the failure to provide him with an opportunity to be heard prior to being suspended without pay.  The only issue here is the adequacy of the post-suspension, pre-termination process.

59(a), premised on several grounds.  "The decision to grant or deny a new trial is within the sound discretion of the trial court . . . ."  Cordis Corp. v. Boston Scientific Corp., 431 F. Supp. 2d 442, 447 (D. Del. 2006).  See also Olefins Trading, Inc. v. Han Yang Chem Corp., 9 F.3d 282, 289-90 (3d Cir. 1993).  The Court may grant a new trial where the "jury's verdict is against the clear weight of the evidence," or where there has been "improper conduct by an attorney or the court [that] unfairly influenced the verdict."  Cordis Corp., 431 F. Supp. 2d at 448.  A motion for a new trial may also be granted where the admission or rejection of evidence resulted in substantial error.  Tristrata Technology, Inc. v. Mary Kay, Inc., 423 F. Supp. 2d 456, 468 (D. Del. 2006) (citing Goodman v. Pennsylvania Turnpike Commission, 293 F.3d 655, 676 (3d Cir. 2002)).

Defendants raise three grounds for a new trial.  First, Defendants argue that the jury's verdict is against the clear weight of the evidence.  Second, they contend that the Court erred by allowing the testimony of Auriel Rodriguez and William F. Gill, which Defendants insist was irrelevant.  Finally, Defendants complain that the Court should not have allowed certain exhibits to be reviewed by the jury during deliberations.

### 1. Verdict Against the Clear Weight of the Evidence

Defendants argue that the verdict in favor of Mr. DeLuzio and against Defendant Bahl on the First Amendment retaliatory discharge claim was against the clear weight of the evidence.  A new trial should be ordered on this ground only "'where a miscarriage of justice would result if

the verdict were to stand,'" Springer v. Henry, 435 F.3d 268, 274 (3d Cir. 2006) (quoting

Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1076 (3d Cir. 1996) (en banc)), or

"where the verdict, on the record, cries out to be overturned or shocks the conscience," Klein v.

Hollings, 992 F.2d 1285, 1290 (3d Cir. 1993) (quoting Williamson v. Consolidated Rail Corp.,

926 F.2d 1344, 1353 (3d Cir. 1991)).

Defendant Bahl points to the allegations against Mr. DeLuzio, such as the missing

documents, Mr. DeLuzio's communications with supervisors, and his inappropriate comments,

among other things, as support that Defendant Bahl would have recommended Mr. DeLuzio's

termination regardless of the protected activity.  In fact, Defendant argues that because of Mr.

DeLuzio's "incredible version of events" in explaining the missing documents, his confrontations

with his supervisors, his "daily barrage" of memoranda, and his inadequate home visits, "it is

inconceivable that [Defendants] would not have recommended that Mr. DeLuzio be terminated."

(Defendants' Memorandum, Dkt. Entry 174-1, at 26-27.)  Defendant, however, fails to cite to

any testimony that explained how Mr. DeLuzio's conduct actually interfered with or otherwise

impeded the operation of C & Y.  Furthermore, Defendant Bahl continues to argue he cannot

be liable because the same evidence relating to Mr. DeLuzio's alleged misconduct was

available to Defendants Iacano and Bielat as it was to Defendant Bahl.  Defendant Bahl ignores

the evidence of his own hostility towards Mr. DeLuzio, and the antagonism that developed and

continued after Mr. DeLuzio's protected speech.  As discussed above, Mr. DeLuzio engaged in

protected First Amendment activity on three occasions; the evidence was sufficient to enable a jury to find that the protected activity was a substantial factor in Defendant Bahl's decision to recommend termination; and Defendant did not sustain his burden to prove he would have made the same recommendation in the absence of the termination.  The jury's verdict on liability, as well as punitive damages, neither shocks the conscience nor represents a miscarriage of justice.  Therefore, contrary to Defendant's position, this case does not warrant the Court's intervention to disturb the jury's verdict.

### 2. Erroneous Admission of Testimony

Defendants argue the Court erred by allowing testimony from two witnesses that they claim was irrelevant.  The Federal Rules of Evidence provide that "[a]ll relevant evidence is [generally] admissible."  FED. R. EVID. 402.  Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence."  FED. R. EVID. 401 (emphasis added).

Even where evidence is erroneously admitted or excluded, a new trial is not warranted where the error is harmless.  See FED. R. EVID. 103(a) ("Error may not be predicated upon a ruling which admits . . . evidence, unless a substantial right of the party is affected . . . ."); FED. R. CIV. P. 61 ("No error in . . . the admission . . . of evidence . . . is ground for granting a new trial . . . unless refusal to take such action appears to the court inconsistent with substantial

justice.").  Under this test, the error is harmless if  "'it is <u>highly</u> <u>probable</u> that the error did not

contribute to the judgment.'"  <u>Renda v. King</u>, 347 F.3d 550, 556 (3d Cir. 2003) (quoting

<u>McQueeney v. Wilmington Trust Co.</u>, 779 F.2d 916, 924 (3d Cir. 1985))

### a) Testimony of Auriel Rodriguez

Auriel Rodriguez testified concerning her interaction with Mr. DeLuzio in relation to her

son as well as to rebut the defense assertion that Mr. DeLuzio had inappropriately contacted

her after she submitted an anonymous complaint to C & Y that was documented in Jennifer

Spencer's memorandum of December 15, 1998.  (PX- 43.)  This incident was presented as a

ground for disciplinary action in the March 26, 1999, letter from Mr. Bahl to Mr. DeLuzio.  Ms

Rodriguez's testimony contradicted the assertion that Mr. DeLuzio had communicated with her

inappropriately in reference to the Spencer memorandum.  The testimony also showed

satisfaction with Mr. DeLuzio's performance as the caseworker for Ms. Rodriguez's son and

rebutted the charge that Mr. DeLuzio had used vulgar language and threatened her son.  The

testimony was highly relevant, and its admission affords no basis for a new trial.

### b) Testimony of William F. Gill

Defendants also object to the testimony of William F. Gill.  Mr. Gill, who worked at C & Y

from February 1994 to November 1995, testified as to the polices and procedures in place at

the time of his employment.  Mr. Gill left C & Y before Defendant Bahl became its

Administrator, although Defendant Bahl was his supervisor.  Mr. Gill testified that he was not

always required to obtain supervisor approval for Family Service Plans before submitting them to the clients, and that occasionally he was late in submitting the plans but was not reprimanded.  He also testified to the strained relationship between Mr. DeLuzio and Paul J. Seybold.

Defendants argue that Mr. Gill's testimony was irrelevant to Mr. DeLuzio's First Amendment retaliation claim, and that the only purpose of the evidence was to demonstrate Mr. DeLuzio was an effective caseworker.  (See Defendants' Memorandum, Dkt. Entry 174-1, at 31.)  Defendants further assert that the  jury relied upon the testimony to render a verdict based upon fairness and justice, rather than the merits of the case.  (Id. at 32.)  Mr. Gill's testimony, however,  was relevant because his failure to obtain supervisor approval for, or to timely submit, Family Service Plans was similar to conduct that formed the basis of the disciplinary charges against Mr. DeLuzio.  If C & Y's enforcement of these rules and polices was generally lax, then its strict enforcement against Mr. DeLuzio would tend to show that he was targeted for exceptional treatment, thereby undermining Defendants' credibility.  While no evidence was presented that Defendant Bahl allowed the lax enforcement of the polices to continue when he became Administrator, there was no evidence that the enforcement did not continue to be lax.  Furthermore, testimony that Plaintiff was an effective caseworker tends to cast doubt on Defendants' assertion that he was fired for deficient performance.  Therefore, Mr. Gill's testimony was relevant.

Even if it was error to allow Mr. Gill to testify, such error was harmless.  Mr. DeLuzio offered evidence revealing Defendant Bahl's hostility towards him in the wake of the three instances of protected speech.  This evidence was more damaging to Defendant's case than Mr. Gill's testimony.  As such, it is "highly probable" that Mr. Gill's testimony did not contribute to the jury's verdict.  Therefore, Defendants' motion for a new trial will be denied.

### 3. Allowing Certain Exhibits to Go to the Jury

Finally, Defendants challenge the decision of the Court to allow certain exhibits to be viewed by the jury during deliberations.[9]  These exhibits are:

PX- 7 – Reprimand from Mr. Seybold to Mr. DeLuzio, dated January 24, 1997

PX- 11 – Memorandum from Mr. DeLuzio to Mr. Seybold regarding Employee Performance Review, dated March 30, 1998

PX- 12 – Arbitrator's Opinion and Award, dated May 3, 1998

PX- 13 – Memorandum from Mr. Bielat to Mr. DeLuzio regarding Expungement of January 24, 1997, Reprimand, dated June 11, 1998

PX- 17 – Employee Performance Review for Period of November 1996 to November 1997

PX- 19 – State Civil Service Commission's Adjudication and Order, dated April 27, 1999, expunging the Employee Performance Review

PX- 22 – Memorandum from Defendant Bahl to Mr. DeLuzio regarding Mrs. M and her son A, dated March 6, 1998

---

[9]Notably, Defendants do not challenge the admissibility of the exhibits.  Nor do Defendants point to any record of any objection to the admissibility of the exhibits.

PX- 26 and 70 – Settlement of Union Grievance regarding March 6, 1998,
Reprimand

Absent prejudice to a party, "[t]he decision of whether or not to send an exhibit to the jury room lies within the sound discretion of the district court."  Young v. Lukens Steel Co., 881 F. Supp. 962, 975 (E.D. Pa. 1994); Skaggs v. Hartford Fin. Group, Inc., No. Civ. A. 1999-CV-3306, 2001 WL 1665334, at *13 (E.D. Pa. Sept. 28, 2001).  This is especially true where an exhibit has previously been introduced and admitted into evidence.  Skaggs, 2001 WL 1665334, at *13.  "Generally, jurors may examine any document properly admitted in evidence." United States v. Williams, 87 F.3d 249, 255 (8th Cir. 1996); see also United States v. DeCoito, 764 F.2d 690, 694-95 (9th Cir. 1985) (no abuse of discretion where district court allows jury during deliberations to examine two written statements admissible under FED. R. EVID. 801(d)(1)(B)); Skaggs,  2001 WL 1665334, at *13 (new trial denied because sending requested performance evaluations to jury during deliberations was not in error).

Defendants argue some of these exhibits solely relate to claims that had been dismissed from the case and, in any event, the exhibits were prejudicial because they suggest that Mr. DeLuzio was treated "unfairly."  (See Defendants' Memorandum, Dkt. Entry 174-1, at 33.) Such "unfair" treatment, however, is relevant to show a pattern of antagonism and hostility of Defendant Bahl towards Mr. DeLuzio in the wake of Mr. DeLuzio's protected activity, thereby supporting the First Amendment retaliation claim.  For instance, Exhibits 7, 12, and 13 relate to the reprimand of Mr. DeLuzio after he followed a child in C & Y custody to Kidspeace National

Hospital.  The reprimand occurred shortly after Mr. DeLuzio's comments to Defendant Bahl about cuts to the C & Y budget.  The fact that a grievance to the reprimand was sustained tends to show that Defendant Bahl overreacted.  Exhibits 11, 17, and 19 relate to the performance evaluation of Mr. DeLuzio, his first during his tenure at C & Y.  Although the performance review was initially challenged on the basis of discrimination because of military service, Mr. DeLuzio testified that Defendant Bahl had a role in the negative evaluation, which is probative of Defendant's retaliatory animus.  Finally, Exhibits 22, 26, and 70 relate to Defendant Bahl's reprimand of Mr. DeLuzio after a parent complained about Mr. DeLuzio's involvement as a caseworker.  Once again, the reprimand and the County's decision to withdraw it tend to show the retaliatory animus Defendant Bahl harbored against Mr. DeLuzio. Therefore, because the exhibits are relevant to Mr. DeLuzio's First Amendment retaliation claim, no error was committed in allowing the jury to view them during deliberations. Consequently, the motion for a new trial will be denied.

## III. **CONCLUSION**

Defendant Bahl's motion for judgment as a matter of law on the First Amendment retaliatory termination claim and the imposition of punitive damages will be denied. Defendants' motion for judgment as a matter of law on the procedural due process and civil conspiracy claims will be granted. Defendants' motion for a new trial will be denied. An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MICHAEL DELUZIO                                      :
          Plaintiff                              :
    VS.                                              :       3:CV-00-1220
                                  :       (JUDGE VANASKIE)

MONROE COUNTY, MONROE              :
COUNTY CHILDREN AND YOUTH        :
SERVICES, CHRISTINA IACANO, SAT   :
P. BAHL, PAUL J. SEYBOLD, RICHARD  :
BIELAT and ROBERT GRESS,               :
          Defendants                         :

## ORDER

**NOW, THIS 30th DAY OF OCTOBER, 2006,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

    1. Defendant Bahl's Motion for Judgment as a Matter of Law (Dkt. Entry 164-1) is **DENIED** as to the First Amendment retaliatory discharge claim.

    2. Defendant Bahl's Motion for Judgment as a Matter of Law (Dkt. Entry 164-1) is **DENIED** as to the award of punitive damages on the First Amendment retaliatory discharge claim.

    3. Defendants' Motion for Judgment as a Matter of Law (Dkt. Entry 164-1) with respect to the procedural due process and civil conspiracy claims is **GRANTED,** and judgment thereon shall be entered in favor of Defendants.

    4. Defendants' Motion for a New Trial (Dkt. Entry 164-1) is **DENIED.**

5. The Clerk of Court is directed to mark this case **CLOSED.**

<u>**s/ Thomas I. Vanaskie**</u>
Thomas I. Vanaskie
United States District Judge